UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHARLEY JAMES                                          CIVIL ACTION

VERSUS                                                 NO. 20-452-DMD

SHERIFF DANIEL EDWARDS, ET AL.

<u>ORDER AND REASONS</u>

Plaintiff, Charley James, a state prisoner, filed the instant civil action pursuant to 42 U.S.C. § 1983.  Although he sued various individuals and asserted numerous claims arising from his incarceration in the Tangipahoa Parish Jail ("TPJ"),[1] only two of his claims currently remain pending:  (1) a claim that he was denied access to clean water and (2) a claim that he was denied the right to exercise his religion.[2]  The remaining defendants have filed a motion for summary judgment with respect to those claims,[3] and plaintiff has opposed the motion.[4]  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).[5]

<u>Summary Judgment Standards</u>

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56.  "An issue is material if its resolution could affect the outcome of the action."  <u>Daniels v. City of Arlington</u>, 246 F.3d 500, 502 (5th Cir. 2001).

---

[1] Plaintiff is now incarcerated at the Tensas Detention Center in Waterproof, Louisiana.  Rec. Doc. 9.
[2] Plaintiff's other claims were withdrawn, dismissed on screening, or voluntarily dismissed.  <u>See</u> Rec. Docs. 10, 14, 17, 19, 31, and 52.
[3] Rec. Doc. 57.
[4] Rec. Doc. 61.
[5] Rec. Doc. 51.

Under Rule 56, the movant bears the initial burden of "showing the absence of a genuine issue as to any material fact." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). The respondent must then "produce evidence or designate specific facts showing the existence of a genuine issue for trial." Engstrom v. First National Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995). Those burdens rest squarely on the parties, and the Court is not obligated to sift through the evidence and construct theories of the case that support or negate a motion for summary judgment. See de la O v. Housing Authority of City of El Paso, 417 F.3d 495, 501 (5th Cir. 2005) ("'Judges are not like pigs, hunting for truffles buried in briefs.'" (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)); Nicholas Acoustics & Specialty Co. v. H & M Construction Co., 695 F.2d 839, 846 (5th Cir. 1983) ("Judges are not ferrets!").

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Moreover, although the Court must "resolve factual controversies in favor of the nonmoving party," it must only do so "where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (quoting Boudreaux v. Swift Transportation Co., 402 F.3d 536, 540 (5th Cir. 2005)). Evidence that is "merely colorable" or "is not significantly probative" is insufficient to defeat summary judgment. Anderson, 477 U.S. at 249. Further, the Court must not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (emphasis omitted).

Simply put, "[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or

2

where it is so overwhelming that it mandates judgment in favor of the movant." <u>Armstrong v. City</u>

<u>of Dallas</u>, 997 F.2d 62, 67 (5th Cir. 1993).

**Plaintiff's Claims**

In his amended complaint, plaintiff stated his claim regarding the denial of clean water as

follows:

> [I]nmate's may not be denied an adequate amount of clean drinking water.  The water here at Tangipahoa Parish Jail is contaminated.  The water and the urinal's are the same connected system.  The water has a pissy smell and taste.  It (The Water) upset's your stomach and cause dizziness and mild headache's.  Not being able to drink contaminated water is a denial of not having clean water.  Water only come's once or twice between meal's.  Through out the rest of the day inmate's have no clean water to drink.  There's no water fountain's, ice cooler's nor daily bottled water.  These claims were caused by defendant(s) Sheriff Daniel Edwards, Warden Martin Heath, Asst. Warden Genie Cooley, and Chief of Security Pittman. Plaintiff is stating that his Eighth Amendment of the Constitution was violated.[6]

Plaintiff stated his claim concerning the denial of the right to exercise his religion as

follows:

> The whole time I was Tangipahoa Parish Jail there has not been any church call out's G.E.D. school was only called every other week.  There was no kind of religious call out's or program's for any religion.  Plaintiff has request form's and other evidence on file with the Court' of request form's that was never answered by the official's of Tangipahoa Parish Jail.  Plaintiff now have disbelief about who he believe's in and wonder if there is a GOD.  Plaintiff daughter passed away on Jan. 17 from a heart attack at the age of 23.  Once plaintiff started receiving mail from the Federal Court and that was the first day plaintiff seen the psychiatrist he was shipped on the same day.  Receiving no medication, no religion call out's, and my daughter death all at a short time at Tangipahoa Parish Jail make's plaintiff believe that GOD let all of this happen.  I haven't been getting on my knee's to pray and my pressure has been high.  Tangipahoa Parish Jail shipped me to a place called Bayou Correctional Center and the condition's were the same as Tangipahoa Parish Jail and some of the inmate's that stabbed me were at Bayou Correctional Center. Tangipahoa Parish Jail didn't allow any religious material to enter their jail as well. I still see black shadows I call demon's and white flashes everywhere I go.  I don't know how to talk too normal people or GOD anymore but I try.  Plaintiff is seeking

---

[6] Rec. Doc. 28, p. 1.

to be compensated $6,000 for being "physically ill", "stressed", and "depressed" from the denial of "freedom of religion".  Plaintiff is claiming a violation of his First Amendment.[7]

Plaintiff further stated that he was suing "Sheriff Daniel Edwards, Warden Martin Heath, Asst. Warden Genie Cooley, and Chief of Security Pittman in their official and individual capacities."[8]

In their motion, the defendants argue that the foregoing allegations are insufficient to state claims against them in either their official or individual capacities.  In addition, they alternatively argue that, in any event, plaintiff's underlying claims have no merit.  They are correct on all points.

## Official-Capacity Claims

As to the official-capacity claims, it is clear that "[o]fficial capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent." Burge v. Parish of St. Tammany, 187 F.3d 452, 466 (5th Cir. 1999).  Accordingly, plaintiff's official-capacity claims are in reality claims against the local governmental body itself.  However, the United States Fifth Circuit Court of Appeals has explained:

> In order to hold a municipality or a local government unit liable under Section 1983 for the misconduct of one of its employees, **a plaintiff must initially allege that an official policy or custom was a cause in fact of the deprivation of rights inflicted**.  To satisfy the cause in fact requirement, **a plaintiff must allege that the custom or policy served as a moving force behind the constitutional violation at issue or that [his] injuries resulted from the execution of an official policy or custom**.  The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts.

---

[7] Id. at pp. 1-2.
[8] Id. at p. 2.  After his amended complaint was filed, plaintiff subsequently voluntarily dismissed all claims against defendant Cooley.  Rec. Docs. 31 and 52.

4

Spiller v. City of Texas City, Police Department, 130 F.3d 162, 167 (5th Cir. 1997) (emphasis added; citations, quotation marks, and brackets omitted).  Further, "[a] plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity."  Colle v. Brazos County, 981 F.2d 237, 245 (5th Cir. 1993); see also Wetzel v. Penzato, Civ. Action No. 09-7211, 2009 WL 5125465, at *3 (E.D. La. Dec. 23, 2009).  Rather, he must identify the policy or custom which allegedly caused the deprivation of his constitutional rights.  See, e.g., Murray v. Town of Mansura, 76 F. App'x 547, 549 (5th Cir. 2003); Treece v. Louisiana, 74 F. App'x 315, 316 (5th Cir. 2003); Wetzel, 2009 WL 5125465, at *3.  In the instant case, plaintiff does not identify such a policy or custom.  Therefore, his allegations fall short of what is required to state proper official-capacity claims.

### **Individual-Capacity Claims**

As to the individual-capacity claims, it is clear that "[p]laintiffs suing governmental officials in their individual capacities ... must allege specific conduct giving rise to a constitutional violation.  This standard requires more than conclusional assertions:  The plaintiff must allege specific facts giving rise to the constitutional claims."  Oliver v. Scott, 276 F.3d 736, 741 (5th Cir. 2002) (citation omitted).  Further, "[p]ersonal involvement is an essential element of a civil rights cause of action."  Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983).

Here, the defendants argue that plaintiff's individual-capacity claims fail because he does not allege that they were personally involved in the purported violations of his constitutional rights.  In his opposition, plaintiff attempts to remedy that defect as to defendant Edwards by stating:

> Sheriff Daniel Edwards participated in the deficient management of subordinates by not answering request(s) form(s) and grievance that was mailed directly to him from the plaintiff.  Also, a supervisor may be liable if a staff member violates your constitutional rights because of that supervisor's mismanagement of

> subordinates.  Sheriff Daniel Edwards didn't care what was going on in his jail by not answering Plaintiff request(s) form(s) are plaintiff grievance.  Sheriff Daniel Edwards while receiving Plaintiff request(s) form's and grievance never changed any policy or took time out too come to T.P.J. to see if Plaintiff was telling the truth about his claim's and injuries. …
>
> …
>
> Sheriff Daniel Edwards failed to inform official's of and train them on policies or custom to stop a constitutional violation. …  Plaintiff suffered constitutional deprivations during his incarceration at T.P.J.  Sheriff Daniel Edwards doesn't enforce his procedure(s) or policie(s) in no form or fashion.  … The Plaintiff filed his grievance early in his incarceration at T.P.J. and the Sheriff denied all claim's by not answering the Plaintiff grievance or his request(s) form(s). …  After Sheriff Daniel Edwards learned about the violation [of Plaintiff's rights] failed to remedy the wrong.[9]

However, even if Edwards personally received and reviewed plaintiff's requests and grievances but took no action to resolve his concerns, that failure would not alone violate plaintiff's constitutional rights.  On the contrary, an inmate has no constitutional right to an adequate and effective grievance procedure or to have his complaints investigated and resolved to his satisfaction.  Bonneville v. Basse, 536 F. App'x 502, 503 (5th Cir. 2013); Propes v. Mays, 169 F. App'x 183, 184-85 (5th Cir. 2006); Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005).

Further, the mere fact that Edwards occupies a supervisory position does not in and of itself serve as a basis for liability, because, "[u]nder section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability."  Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).  Rather, again, it is a defendant's personal involvement, not merely the nature of his position, which is determinative.  Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009) ("In a § 1983 suit ... – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer.   Absent vicarious liability, each Government official, his or her title

---

[9] Rec. Doc. 61, pp. 102-03.

notwithstanding, is only liable for his or her own misconduct."); Sanchez v. Young County, 866 F.3d 274, 281 (5th Cir. 2017) ("Supervisors cannot be held liable for constitutional violations committed within the jail if they had no personal involvement.").

On the other hand, a supervisory official obviously can be held liable for a constitutional violation resulting from his own personal failure to train or supervise his subordinates, and, based on the foregoing statements in his opposition, that appears to be the theory under which plaintiff has sued Edwards. However, with respect to claims proceeding under that theory, the United States Fifth Circuit Court of Appeals has held:

> In order to survive summary judgment against a § 1983 claim for supervisory liability, a plaintiff is required to create a dispute of fact that (1) the supervisor either failed to supervise or train the subordinate officer; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights, and (3) the failure to train or supervise amounts to deliberate indifference.
> … Deliberate indifference is a stringent standard of fault, requiring proof that a [defendant] disregarded a known or obvious consequence of his action … Deliberate indifference can be demonstrated in two ways. First, a plaintiff may demonstrate that a [defendant] had notice of **a pattern of similar violations**. Second, a plaintiff may demonstrate liability based on a **single incident** if the constitutional violation was the highly predictable consequence of a particular failure to train.

Davidson v. City of Stafford, 848 F.3d 384, 397 (5th Cir. 2017) (emphasis added; citations and quotation marks).

Plaintiff has not offered any evidence of the first type. He has pointed to no evidence whatsoever showing there were prior incidents, much less that Edwards was aware of any such prior incidents.

Further, as to the second method for showing such deliberate indifference, the United States Fifth Circuit Court of Appeals initially acknowledged the existence of the "single incident" exception in Brown v. Bryan County, 219 F.3d 450 (5th Cir. 2000). However, in doing so, the

court took care to note that a plaintiff seeking to impose liability under that theory faces a daunting

burden:  he must be able to show the defendant's "unmistakable culpability and clearly connected

causation."  Id. at 461.

   The Fifth Circuit subsequently observed that "[t]he single incident exception … is a narrow

one, and one that we have been reluctant to expand."  Burge v. St. Tammany Parish, 336 F.3d 363,

373 (5th Cir. 2003).  Moreover, courts have been quick to distinguish Brown by noting that the

finding of liability in that case stemmed from the particularly egregious facts involving the use of

excessive force by a twenty-one year old, untrained reserve deputy with a history of violent

behavior.[10]  Because such egregious facts are not present in most cases, the exception is rarely

found to be applicable.  See Littell v. Houston Independent School District, 894 F.3d 616, 627 n.6

(5th Cir. 2018) ("We count only one published 'single incident' failure-to-train case in our circuit

in which the plaintiff prevailed.").

---

[10] See, e.g., Curran v. Aleshire, 67 F. Supp. 3d 741, 759 (E.D. La. 2014) ("[Brown] contains three underpinnings …. First, the court found that the sheriff provided no training or supervision (at least not formally) to the offending officer. Second, the court observed the background of the officer at issue, which included the following:  no prior experience or education in law enforcement; twenty-one years of age; arrests for assault and battery, resisting arrest, public drunkenness, driving while intoxicated, possession of false identification, driving with a suspended license, nine moving traffic violations, an outstanding arrest warrant; and, an "excessive number of takedown arrests" in his few weeks on the job similar to but preceding the central incident in that case.  Third, … the court explained why it upheld a finding that the sheriff had notice of the officer's background.  It came to this conclusion on the basis of the family relationship between the sheriff and the officer, the small size of the police department, the arrests that the sheriff had authorized the officer to make, and the sheriff's recent review of the officer's background file made available to him containing the information regarding his arrests." (citations omitted)), appeal dismissed, 800 F.3d 656 (5th Cir. 2015); Williams v. City of Cleveland, Civ. Action No. 2:10cv215, 2012 WL 3614418, at *18 (N.D. Miss. Aug. 21, 2012) ("The Fifth Circuit has considered single violation liability several times, and, with only one exception in some thirty years since Monell, has consistently rejected application of the single incident exception.  The sole exception, Brown v. Bryan County, involved a failure to train a neophyte on the constitutional limits to the use of force.  The facts of Brown demonstrate that single violation liability applies **only in extreme circumstances**.  In Brown, the offending officer was the sheriff's nephew who had been on the job for only a few weeks and had no education or experience whatsoever in law enforcement.  Moreover, shortly before joining the sheriff's office, he had been arrested for several crimes, including assault and battery." (emphasis added; citations omitted)), aff'd, 736 F.3d 684 (5th Cir. 2013); Burrell v. Adkins, Civ. Action No. 3:01CV2679, 2008 WL 130789, at *2 (W.D. La. Jan. 10, 2008) ("The facts of Brown are illuminating.  There, the direct offender was a reserve officer (not a full-fledged deputy) who had been hired with no experience and no training and who had already demonstrated a propensity for unnecessarily rough treatment of arrestees over just a few weeks on the job.").

Here, plaintiff has presented no evidence establishing that the "single incident" exception would apply. The facts he has alleged, even if true, are not in any way analogous to the egregious facts in Brown. Further, he has not properly made any nonconclusory allegations concerning the training protocols for T.P.J. staff or the level of supervision of the T.P.J. staff. Accordingly, even if he is attempting to proceed against any of the named defendants based on a "failure to train or supervise" theory liability, he has not met his burden to properly allege (much less direct the Court to colorable evidence supporting) that theory.

## Merits of Plaintiff's Claims

Lastly, even aside from the defects already identified herein, summary judgment is also appropriate for a more basic reason: plaintiff's claims fail on the merits for the reasons explained below.

## Water Claim

As to plaintiff's claim that he was denied access to clean water, that allegation, if true, would be actionable because "potable water is a basic human need and must be provided to inmates." Maddox v. Gusman, Civ. Action No. 14-2435, 2015 WL 1274081, at *4 (E.D. La. Mar. 19, 2015); accord Brooks v. Shinault, Civ. Action No. 6:18cv402, 2019 WL 2240713, at *3 (E.D. Tex. Apr. 16, 2019) ("An inmate is, of course, entitled to drinking water."), adopted, 2019 WL 2210696 (E.D. Tex. May 20, 2019); Planker v. Christie, Civ. Action No. 13-4464, 2015 WL 268847, at *26 (D.N.J. Jan. 21, 2015).

However, the defendants argue that plaintiff's allegations concerning his access to water are simply untrue. In support of that argument, they have provided an affidavit of Tangipahoa Parish Jail Assistant Warden Alisa Quinn, who stated in pertinent part:

31. The sinks in the inmate dorms in TPJ are industrial "combination units," meaning that the toilets and sinks are one large fixture.

32. Attached hereto as Exhibit "A-4" is a photograph of the combination unit at issue.

33. Although the combination units are installed as one large fixture, the toilet waste is not mingled with the running tap water.

34. The combination units are serviced by the Parish Maintenance Director as needed.

35. The tap water produced by the combination units is the same tap water found in the entire facility, including in the staff areas.

36. The combinations [sic] units have been in place for years and are still in place today.

37. I have no recollection of any inmate ever complaining about the tap water or claiming that the water made them ill in any way.

38. TPJ inmates have access to drinking water, juices, and milks at every meal.

39. Additional drinking water is brought around to the inmates between meals.

40. There are also beverages available for purchase through the facility commissary.[11]

In his opposition, plaintiff disputes several of Assistant Warden Quinn's statements in her affidavit. Specifically, he stated:

1. "Plaintiff states that the water does have a pissy smell and taste. Plaintiff was also treated by a doctor and issued medicine by a nurse(s) for his sickness from having to drink T.P.J. tap water daily."[12]

2. "Inmate's at T.P.J. no access and are not issued milk's at every meal unless they work in the kitchen. During plaintiff incarceration at T.P.J. water was only passed out (2) two or (3) three time's, juices are not passed-out between. The juice that inmate's receive between meal's look's like

---

[11] Rec. Doc. 57-4, pp. 3-4.
[12] Rec. Doc. 61, p. 53.

       lemonade but taste weird and as soon as you drink it, (5) five or (6) seconds later you have to urinate."[13]

3.     "Inmate's at T.P.J. doesn't get potable drinking water between meal's everyday."[14]

Clearly, there is no dispute that water was available to plaintiff throughout the day from the faucet in his cell, but he argues that is not dispositive in his case.  Although such ready availability would normally suffice to defeat a claim for denial of adequate drinking water, see, e.g., Patin v. LeBlanc, Civ. Action No. 11-3071, 2012 WL 3109402, at *22 (E.D. La. May 18, 2012), adopted, 2012 WL 3109398 (E.D. La. July 31, 2012), plaintiff contends that it is insufficient to defeat his particular claim because the water from the cell faucets at T.P.J. was **contaminated**. The problem, however, is that his unsubstantiated belief that the water was contaminated is not alone sufficient to defeat the instant motion.  See, e.g., Williams v. LeBlanc, Civ. Action No. 14-00519, 2015 WL 539535, at *3 (M.D. La. Feb. 9, 2015) (noting that prisoner's "mere personal belief that the water at [the prison] is contaminated is not sufficient to support a claim before this Court").  Rather, the defendants are entitled to summary judgment unless plaintiff can point to actual **evidence** from which a reasonable jury could conclude that the drinking water was in fact contaminated to such a degree that it was demonstrably unsafe.  See Wright v. New York State Department of Correctional Services, 372 F. App'x 175, 176 (2d Cir. 2010); Amos v. Cain, No. 4:20-CV-7, 2021 WL 1080518, at *18 (N.D. Miss. Mar. 19, 2021).[15]  Because plaintiff has not

---

[13] Id. at p. 56.

[14] Id.

[15] Although plaintiff seems to suggest that testing of the water would provide evidence of contamination, see Rec. Doc. 61, p. 53, he does not indicate that such testing has occurred and, without more, he is not entitled to have this Court appoint an expert to test the water for contamination.  See Williams, 2015 WL 539535, at *3.

pointed to any evidence that the water was actually unsafe (as opposed to being merely unpalatable), this claim fails.

## Religion Claim

Plaintiff additionally claims that he was denied the right to exercise his religion.  Regarding such claims, the United States Supreme Court has held:  "[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.  Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348-49 (1987) (citations and quotation marks omitted).[16]  However, that right is not without limitation.  On the contrary, the Supreme Court explained:

> Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.  The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives – including deterrence of crime, rehabilitation of prisoners, and institutional security.

Id. at 348 (citation, quotation marks, and textual alteration omitted).

In cases in which a prisoner alleges that his right to exercise his religion has been violated, the issue in dispute normally is whether a particular restriction was reasonably related to legitimate penological interests.  See id. at 349.  In the instant case, however, the parties' disagreement is even more fundamental – the dispute centers not on whether the restrictions alleged by plaintiff were **reasonable**, but rather whether they existed **at all**.  As noted, plaintiff alleges that there was

---

[16] In their motion, the defendants, perhaps as a precaution, analyze plaintiff's claims under both the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  However, in his opposition to the motion, plaintiff makes clear that he is **not** asserting a RLUIPA claim and is instead asserting **only** a First Amendment claim. Rec. Doc. 61, p. 100.

no opportunity for him to participate in religious services or to obtain and possess religious materials; however, the defendants contend that is again simply untrue.

In support of their position, the defendants again rely on the affidavit of Assistant Warden Alisa Quinn, who stated in pertinent part:

3.    I am a keeper of records of the TPJ and have access to the facility's records in the form in which they are originally made and maintained.

4.    I have reviewed Charley James's inmate records held by the TPJ.

5.    Charley James was a Department of Public Safety & Corrections ("DPS&C") inmate housed in the TPJ from January 6, 2020, to February 20, 2020.

6.    According to the Charley James's DPS&C paperwork, he self-identifies as Baptist.

7.    During the time of Charley James's incarceration in the TPJ, prior to the Covid-19 Pandemic, the TPJ reserved time and space for religious callouts every Thursday in the TPJ Classroom.

8.    Attached hereto as Exhibit "A-1" is the callout schedule that was in effect during Charley James's incarceration.

9.    That callout schedule was posted on the TPJ bulletin board in plain sight of all inmates.

10.   Any inmate who wishes to sign up for religious callouts is allowed to do so, subject to any current disciplinary restrictions the inmate may have.

11.   Religious services are conducted by local volunteer religious leaders.

12.   If more inmates sign up for services than space in the classroom allows, then participation is rotated by dorm to give all inmates an opportunity to participate.

13.   Inmates are also allowed to meet individually with religious leaders if they add them to their visitors' list and the religious leader agrees to meet with them.

14.     Generally, the different volunteers came on their assigned Thursday every month prior to the Covid-19 Pandemic.

15.     If the volunteers did not come, there was no one to lead the religious callouts.

16.     Attached hereto as Exhibit "A-2" is the TPJ Visitors Register from the months of January and February, 2020.

17.     The Visitors Register is a record of all visitors who enter the TPJ.

18.     The volunteer religious leaders who lead the religious callouts sign in on the register.

19.     The register shows that on January 3, 2020, a volunteer, Evangelist Joyce Cox, came to lead the women's bible study callout.

20.     The register shows that on January 29, 2020, a volunteer, Reverend Roy Burton, came to lead the Men's Ministry callout.  Reverend Burton is a Baptist.

21.     The register shows that on January 30, 2020, a volunteer, Deacon Nat Garafola, came to lead the Catholic Ministry callout.

22.     The register shows that on February 12, 2020, a volunteer who did not sign their name came to lead the Catholic Ministry callout.

23.     The register shows that on February 26, 2020, a volunteer, Reverend Roy Burton, came to lead the Men's Ministry callout.

24.     It is TPJ policy that inmates are allowed to order religious books such as Bibles.

25.     The only restriction is that the book must be a paperback.

26.     The TPJ does not allow inmates to have hardback books because inmates are known to fashion the covers of hardback books into storage areas for illicit contraband.

27.     There is no record in Charley James's inmate file that he ever attempted to order a Bible or other religious book.

28.     There is no record in Charley James's inmate file that he was ever denied a Bible or other religious book that he attempted to order.

14

29.     TPJ inmates are free to congregate, pray, and discuss their religion with any other inmates with whom they are housed as long as it does not cause violence or other security concerns.

30.     TPJ inmates are free to engage in prayer or meditation in their cells.[17]

In his opposition, plaintiff confirms that he was incarcerated at TPJ from January 6, 2020 – February 20, 2020 and that he is a Baptist.[18]   However, he disputes much of the remainder of Assistant Warden Quinn's affidavit.   Specifically, he contends:

1.     The jail classroom was not reserved for religious callouts every Thursday.[19]

2.     The callout schedule was not posted on the jail bulletin board in plain sight of all inmates, and, in fact, there was no bulletin board in the first or second dorm while he was incarcerated at the jail.[20]

3.     The inmates did not have an opportunity to sign up for religious callouts, no religious call-outs were available during his incarceration, and jail officials stated that "they couldn't have religious callouts because inmate's were too violent and possessed weapon's and drug's."[21]

4.     He never met or saw any volunteer religious leaders.[22]

5.     No one told him he could be visited by a religious leader.[23]

6.     He was not allowed to order religious books and could not order anything from his inmate account because there were no withdrawal forms.[24]

7.     "If inmate's congregate, pray, and discuss their religion, the other inmate's and guard's will think your weak and start fight's to test you."[25]

---

[17] Rec Doc. 56-4, pp. 1-3.
[18] Rec. Doc. 61, p. 2.
[19] Id. at pp. 2-3.
[20] Id. at pp. 3 and 70.
[21] Id. at pp. 3 and 71
[22] Id. at p. 4.
[23] Id. at p. 7.
[24] Id. at pp. 47, 52, and 72.
[25] Id. at p. 52; see also id. at p. 73.

In addition, plaintiff has submitted declarations from five of his fellow inmates at Tensas Detention Center ("TDC"):   Gary Vicknair;[26] Chezarae Johnson;[27] Kerry Ledet;[28] Anthony Dudley;[29] and Hayven Auguillard.[30]  To the extent that those affidavits are intended to support plaintiff's contention that religious practice was duly restricted during his time at TPJ, those declarations are of little or no value because the five inmates have no firsthand knowledge on that issue – they were not at TPJ while plaintiff was there.  Although Vicknair and Auguillard were both incarcerated at the TPJ on other occasions, they were not there during plaintiff's period of incarceration.   As for Johnson, Ledet, and Dudley, there is no indication they were ever incarcerated at the TPJ.

Further, if those affidavits, as well as separate declaration from plaintiff himself recounting his participation in religious activities at TDC,[31] were intended to support plaintiff's contention that his religious beliefs are **sincere**, they are unnecessary.  It is true that "[t]o fall within the purview of the Free Exercise Clause, a claimant must possess a sincere religious belief." DeMarco v. Davis, 914 F.3d 383, 388 (5th Cir.), cert. denied, 140 S. Ct. 250 (2019).  However, in the instant case, the defendants do not challenge the sincerity of plaintiff's religious beliefs, and this Court has no reason whatsoever to doubt his sincerity.

Rather, the question before the Court is not whether plaintiff's religious beliefs are sincere, but it is instead whether the alleged restrictions his religious practices in fact existed.  As noted, defendants submitted evidence showing that religious leaders were permitted to visit with and

---

[26] Id. at pp. 85-86.
[27] Id. at p. 87.
[28] Id. at p. 88.
[29] Id. at p. 89.
[30] Id. at p. 92.
[31] Id. at pp. 90-91.

conduct services for TPJ inmates during the time plaintiff was incarcerated there. They also produced evidenced that inmates were generally able to obtain and possess religious materials. Although plaintiff faults the defendants for not submitting even more definitive evidence, such as declarations from the spiritual advisors corroborating that they in fact visited the jail as reflected on the defendants' visitation logs, that simply is not their burden.

Rather, to reiterate, the Court must always be mindful of shifting of burdens occasioned on summary judgment. As the United States Fifth Circuit Court of Appeals recently concisely explained:

> Under the ordinary summary-judgment standard, the party who moves for summary judgment bears the initial burden to show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The movant satisfies this burden by showing that a reasonable jury could not find for the nonmovant, based on the burdens that would apply at trial. For a defendant, this means showing that the record cannot support a win for the plaintiff – either because the plaintiff has a failure of proof on an essential element of its claim or because the defendant has insurmountable proof on its affirmative defense to that claim. The defendant can show this by introducing undisputed evidence or by pointing out an absence of evidence to support the plaintiff's case. If the defendant succeeds on that showing, the burden shifts to the plaintiff to demonstrate that there is a genuine issue of material fact and that the evidence favoring the plaintiff permits a jury verdict in the plaintiff's favor.

Joseph ex rel. Estate of Joseph v. Bartlett, 981 F.3d 319, 329 (5th Cir. 2020) (footnotes, quotation marks, brackets, and ellipsis omitted).

Here, the defendants pointed out an absence of proof of plaintiff's claim, shifting the burden to him to produce such evidence. Plaintiff was then required to demonstrate "by competent summary judgment proof that there is an issue of material fact warranting trial. Only when there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party is a full trial on the merits warranted." Lindsey v. Sears Roebuck & Co., 16 F.3d 616, 618 (5th Cir.

1994) (citations and quotation marks omitted).  Plaintiff cannot make that showing by relying on conclusory allegations, speculation, and unsubstantiated assertions.  <u>See, e.g.</u>, <u>Ortega Garcia v. United States</u>, 986 F.3d 513, 533 (5th Cir. 2021).

Plaintiff simply has not met his burden to point to actual evidence showing that a genuine issue of material fact exists in this case.  At best, plaintiff has established only that he was **unaware** that possibilities existed at TPJ for exercising his religion.  That, however, is not the same thing as producing evidence that would permit a jury to find that those possibilities did not in fact exist.  Because plaintiff has not met his burden, the defendants are entitled to summary judgment.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment, Rec. Doc. 57, is **GRANTED** and that plaintiff's remaining claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this _10th_ day of May, 2021.


_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**